Good morning. I'm Mary Gilg. I'm representing Thavin Om. I'd like to reserve about two minutes for rebuttal, and I'll try to keep my eye on that. Thavin Om is a survivor of the Cambodian genocide. Her entire family died in the genocide. She herself was kidnapped, forced into forced labor, and tortured. After two years at a refugee camp in Thailand, she came to the United States in 1981 only to marry an individual who was abusive to her. She eventually had to leave that relationship when she felt that her life was threatened by his abuse. With that relationship, she left four children. Ms. Om has only worked sporadically in the United States. She hasn't worked at all since 1990. She's never worked more than a couple of months at a time and never earned the level of substantial gainful activity for an entire year. Despite this, when she went before an ALJ in 2008 asking for Social Security SSI benefits, the ALJ essentially thought that she was lying. Am I right that that's really what this whole case turns on, is whether there's enough record support for that adverse credibility finding? I think that's the crisis of the case, Your Honor. I think that's true. I don't know that I'm right on this, but can the ALJ sort of count against your client the fact that she wouldn't submit to this independent exam? I mean, is that just, you know, I understand your point that, well, okay, that just means there's less information in the record, but I don't know. If outside of this context, I would say if I have doubts about whether someone's telling the truth, and I say, well, you know what, one way to figure this out is once you go see this independent expert and the person says, no, thanks, they might have findings against me. I just kind of think, boy, that sort of counts against you in terms of your credibility. So am I wrong on that? I think that the case law does support using a failure to attend consultative exams toward a credibility sort of finding. In this case, it's not clear that that's what the ALJ actually did. His statement in his decision is something along the lines of, because she didn't attend these consultative exams, I now must consider that in determining her disability. And he also entitled to rely on counsel's representations as to why he advised her to do that? Again, I don't know. I apologize if I'm getting the genders wrong. But your client's or maybe it was you. It was not me. It was not you. That's right. It was someone else. It was someone else. You remember that now. It was a he. Yes. Said, I don't want my client to submit to this exam because I sort of fear that the findings aren't going to be good and I'd rather have her go see this other person of my selection. Isn't ALJ entitled to take that into account as well? So a couple of different things. This case is a little bit unusual procedurally in the way that these cases happen. And so initially when she first filed her claim, she did go to see the consultative examining doctors, both a physical doctor and a mental health doctor. Those, the report of Dr. McGee, the psychological evaluator, was actually in the record when she was first allowed. Then she was investigated. After the investigation, her case was reopened and she was denied. And so it makes sense, given those facts, that her attorney would advise her maybe it's not the best idea to go. But he, I thought he advised her not to go because he didn't think that the consultative examiners generally understood the Cambodian experience. And her lawyer also said that the CE would likely harm her case and would likely be adverse to her case. And the ALJ found, considering all that, no good cause for her failure to attend. I understand the regulation to say that if you don't appear, that can be King's X, end of story on disability. Well, Your Honor, that brings me to my next point, so thank you for that, which is that the consideration of why she didn't attend goes to whether or not there was good cause. And my reading of the regulation in concert with the HALX, which is what tells the ALJ how to act on the regulation, is that the regulation states for an initial application, if you don't attend the CE, we may find you disabled. A CE is scheduled because there's not sufficient evidence in the record at that point to determine disability. So it makes sense that if you don't go, we don't have sufficient evidence, we can find you disabled. The next line in the same paragraph. Not disabled, you mean? Yes. Okay. I'm sorry. I understood what you meant. The next line of that same regulation states that in a continuing disability review, if you don't go to the CE, we may find you not disabled because you didn't attend the CE. So it's clear that for the continuing disability review, you can be found disabled as a result. What seems to me is the case is that with an initial application, the HALX instructs a judge, even if somebody doesn't have good cause and they didn't go to the CE, you need to make a finding based on the evidence that's in the file. And that says to me that you can't make a finding just based on the fact that the person didn't go to a CE. And I think that's in line with the Social Security Act in general. It's a remedial statute. It's meant to be construed liberally. There are all sorts of good cause provisions for late filings and good cause for reopenings. And generally, the Social Security Act understands that people applying for Social Security, if they're eligible, are disabled and have barriers to actually doing things, jumping through the hoops. The other thing is that although the attorney in this case at the hearing level did send Ms. Ohm to another doctor, it wasn't – it was a year – there was a year that had spanned. It wasn't like he got the notices for the CEs and said, oh, no, no, we're not going to send you there. Come see this doctor instead. Instead what happened is he got the notices for a variety of reasons, which I think he outlined very – in a very forthright manner, advised Ms. Ohm not to go. She didn't go, acting on his advice. And she got denied. And then as the hearing approached in July of 2008, that same month, she got evaluated by another psychological examiner. So it wasn't like a sort of knee-jerk reaction to send her immediately to this – to this other individual psychological examiner. Okay. What about the other bases? Can I just ask one further question on this subject? Who was it who advised her not to go to the – to the doctor here? It was the – her attorney at the time. Was that a – you're from an agency? It's – yes. Yes, it's someone at my agency. What's the name of that agency? The Homeless Action Center. And it was a lawyer from that Homeless Action Center that did? Yes. Advise her in that case? Yes. Okay. What is the Homeless Action Center? We're a legal services nonprofit in the East Bay. And we represent people solely on SSI and Social Security disability cases. Do you know of any case in which the failure of someone to go to a particular doctor was on the recommendation of a public agency or public service agency as opposed to an individually – individual practitioner? I am not familiar with any cases that make that distinction. Or any cases in which the plaintiff was – lost benefits she might otherwise be entitled to because she relied on the advice of a public service agency? No. Thank you. I was just going to ask, I mean, I think we've explored this topic. Maybe you want to address the other bases for the ALJ's adverse? Yes. Yes. So as you indicated, Judge Watford, I think that the – that the crux of this case is that the ALJ just didn't believe Ms. Ohm. And because of that, he also didn't grant a lot of weight to the statements of her treating physicians. She had, in this case, a treating psychiatrist and a treating therapist. And these individuals had diagnosed with post-traumatic stress disorder as well as depression. But you would concede that the weight to be given to their findings really does turn on whether your client is credible, right? Most of it is based on information she's reporting to them? I think not 100 percent. I think obviously – A hundred percent. Aren't most Social Security cases based on what the individual reports to the doctor, what her problems are? There are two kinds. One is where it's supported by measurable evidence. And like the pain cases, for instance, an examiner can't just say, well, I don't believe you. The examiner has to, even in pain cases which are entirely subjective, has to have a good reason in the record for rejecting the testimony of a treating physician. Right. Now, what cases are you – do you think are controlling here as to the question that Dr. Watford asked, which is, is it enough for a – what, a Social Security judge to say, I just don't believe your testimony, therefore I'm going to disregard the findings of the treating physician? What cases are there that control that issue? Well, the case law certainly indicates that an ALJ, if the findings of the doctors are based entirely on what the claimant has said to them, and that claimant is found to be not credible, then the ALJ can certainly use that in weighing the evidence. I think, though, in this case, the Ryan v. Commissioner is relevant. And in that case, it was held that an ALJ can't reject the treating doctor's opinion by questioning the credibility of the patient's complaints if the doctor doesn't question the credibility of the patient's complaints and supports their findings with their own personal observations. It's necessarily the case in mental health cases that a lot of what goes into diagnosis is based on what the claimant is telling you. Sorry, just the case again, Ryan. Ryan v. Commissioner. It's 528 F. 3rd, 1194. Okay. Thanks. Sorry. And so in this case, her therapist and her psychiatrist were trained to work with this population. They work at the Center for Empowering Refugees. They're trained to listen to people, assess credibility, and diagnose based on that evidence. For the ALJ to supplant that with his own judgment just based on a brief meeting with her and on some doubts that arose from who her doctor was and, you know, how that all happened, rejects the doctors for a reason that's not valid. If the doctors had said she were not sure if this is what's going on with her and never noted anything else in the record. One doctor did say that, right, that he felt based on his discussions with her he was unable to come to a conclusion. Right. That's correct. Dr. McGee did state some doubts about whether Ms. Ohm had put forth a full effort, and this was the consultative examining doctor. Looked at in concert with the rest of the records, with the evaluation of Dr. D'Souza and the records from Dr. Zafari and Gracer, it's clear that Ms. Ohm does have some serious cognitive deficits, some serious problems with concentration and persistence, and that Dr. McGee's doubts about whether she was putting forth a full effort don't amount to a substantial reason. Well, how do you weigh the treating physician's testimony or findings against the examining physician who says it's inconclusive and the treating physician says that there is this disability? What's the test for determining when you can disregard the treating physicians on the basis of an inconclusive finding by an examining physician? And do you have a case regarding that? I don't have a case regarding that, and I think that the reason that I don't is because it was inconclusive. She didn't make any actual findings as to what Ms. Ohm's abilities were or inabilities were. And so when you have a treating physician that's supported by several months of treatment, supported by notes from both a doctor as well as a therapist, and never notes objective findings like she's crying when she talks about her past trauma, she's looking disheveled, she's frequently guarded and agitated, that's what should get the weight here, absent a lot of what Dr. McGee expressed are not specific illusions. And I'm out of time. Thank you. Thank you. I will give you two minutes to rebuttal. Thank you. May it please the Court. Good morning, Your Honors. Good morning, Ms. Gailey. My name is Elizabeth Berry. I'm here for the defendant, Carolyn Colvin, the Acting Commissioner of Social Security. The Commissioner recognizes that this matter involves some delicate issues. It involves a claimant who is an immigrant who has limited English proficiency. Can you maybe just take a half-step closer to the mic? You're just a little bit soft-spoken. Or speak up a little. Is this better? Yes. Should I start over? No. Go ahead. She is this claimant is an immigrant. She has limited English proficiency, and she's asserting a mental impairment. In addition to that, the medical opinion evidence in this case is conflicting, and plaintiff's statements to the agency in support of her application conflict You say the medical or basically the testimony of the doctors you think is conflicting? The opinion evidence. And are you talking about Dr. McGee is the one that? Dr. McGee, yes. But is Dr. McGee a he or a she? I think it's a woman. I think it's a man. So you don't know. It's one or the other. The first name is a little challenging. I was going to do an Internet search this morning about my Internet explorer. We tried that and came up with inconclusive answers as well. That's conflicting. Well, that's my point. Right. Dr. McGee doesn't make findings that are in conflict with the opinions of the other doctors. Well, I think that she does or he does. The evidence from the other doctors, the evidence from the other doctors is that she has severe impairments, and Dr. McGee performs various tests, and the results are that the claimant has difficulty identifying the shape of a ball. She is unable to make very simple drawings, but then later in the examination can perform much more complex tasks. What conclusion does the doctor draw from that? The conclusion is that she tests so poorly that she tests in what she terms the mildly mentally retarded range. And the conclusion is that these test results are inconsistent. They are internally inconsistent, and she can't rely on them. And she can't rely on them to a point. But she did not express a conclusion that he was lying or that she didn't have it. The conclusion she expressed was that she couldn't tell. She did not, was unable to reach a conclusion. I don't know that she said that she couldn't tell as much as she said these findings are. What did she say? Do you have her language? Yes. Because I don't. So tell us what exactly she said in her conclusion. If you could just give us the page that you're looking at. It's 220. It says of the administrative record, which is exhibit. Is it page 220? Oh, sorry. It's of the administrative record. It's exhibit 9E in the excerpts of record. 226 is the page. This looks like the first page of her, his or her report. 226. And she says she's not giving forth her best effort, that she has trouble identifying the days of the week. She can't identify the shape of a ball. And that these, and she's giving answers that are obviously incorrect. That's how the doctor characterizes them. And that it also, she's, she knows, this doctor knows that she's taken and passed a California driver's license test, that she's had years of formal schooling. Well, how about page 229? Okay. I mean, I see test results, and it says this examiner does not know whether or not the claimant's test results are valid indicators of her true level of functioning. That just to me is a, I can't tell. Not that I have reached some conclusion that's opposite the one that the other doctors have reached. I think it could be read, I think it's more properly. Let me give you another one. Okay. Several pages later, it's actually, one might call a conclusion. It's at the end of the report. It says, therefore, this examiner does not feel comfortable making any definitive statements about this claimant's cognitive ability to work at this time. That is the conclusion. It's physically the conclusion. It's at the end of her report. Now, that, I would think you would say, is a determination that she is not able to make a definitive statement about whether she can work at this time, which speaks for itself. It's not a conclusion, I conclude, that she is able to work. It's that I am unable to make a definitive statement. But I don't think that's the same thing as saying that she's not, that it doesn't have any meaning. I think what she's saying is that she has no confidence in these test results. And so she's going to, she's not going to come out and say that the claimant isn't telling the truth. She can't know that. But what she can say is, I have no confidence in these test results, and I can't make a determination about her ability to work as a result. We only went down this path, in my view, because you said that medical opinion evidence conflicts. And I just, I don't, this report doesn't support that statement, in my view. So what I mean in saying that is that, you know, there were similar test results performed by the examining doctor, Dr. D'Souza, who was the doctor that plaintiff's counsel ordered plaintiff to see. And that doctor makes similar examination findings. She can't perform simple, she can't make simple drawings. She can't, I think, add between up from 1 to 25. And that doctor concludes that she has severe limitations as a result. And this doctor, Dr. McGee, makes similar examination findings, but is troubled by them. And notes that, the doctor notes that she's troubled by them. And that she was making obvious errors, that the doctor could tell that she was not putting forth her best effort, and that she was clearly making mistakes, seemingly on purpose, obviously. And so that's how they are inconsistent. It's true that Dr. McGee doesn't make conclusions about her abilities, but that doesn't mean that she's not, doesn't have a meaningful, it's not meaningful opinion evidence, it's not meaningful evidence. It is because the reasons for her inability to make a determination about her limitations and abilities is because the integrity of the results are in doubt. But what about Dr. Graeser? Dr. Graeser finds PSTD. Right. Based presumably on his observations. I recognize there's this subjective reporting of one's own symptoms. But what is inconsistent with that finding by Dr. Graeser? Well, you know, the ALG talks about Dr. Graeser's treatment records. And he notes that, you know, during this time, Dr. Graeser is saying that she's responding well to medication, that she's doing well. But he makes a PTSD, a post-traumatic stress disorder diagnosis. And the ALJ says it looks like the conclusions of Dr. Graeser's, in Dr. Graeser's opinion, are based on this PTSD diagnosis. And the ALJ finds that the doctor didn't conduct an analysis of PTSD, according to the DSM, and that it can't be just simply based on a person's statements. It has to follow with a rigorous analysis by a medical, a medically accepted source. But we don't really know how he came to that conclusion. No. And do we have to know that from the records? Or should we presume he did what a competent treating physician would do to reach that conclusion? Well, the ALJ found that, looking at the treatment records, his notes that she's responding well to medication, she's doing okay, she's calm, she has stress, but she's coping. And then this PTSD diagnosis, and then the ALJ sets out all the criteria for PTSD, the A through F criteria. And the ALJ notes, you know, these are absent from the treating records, and they're absent from this doctor's opinion. And so the conclusions of the report, of the opinion, are undermined as a result. Just a random question. Do you know the date for this Harvard trauma questionnaire? Yes. I think it's... I just can't read it on the... It's May 2007. 2007. Okay. Thanks. And so the ALJ, you know, recognizing the sensitive nature of some of the issues in this case, and the conflicting medical evidence, and plaintiff's seemingly inconsistent statements about her English proficiency, the case, the ALJ said, you know, this case, it's fairly complex, and there are serious issues about claimant's credibility. And what's significant is that the ALJ, there was a lot of discussion when plaintiff's counsel was, or appellant's counsel was speaking about the CEs and the plaintiff's or appellant's failure to attend the CEs at the instruction of her attorney. But there's a lot of other evidence in this case that the ALJ relied on. The ALJ looked at the time... Why does the ALJ determine that the treating physicians failed to use the DSM-4 criteria in the PDSD diagnosis, invalidates his diagnosis? Well, because the ALJ is looking at the treatment notes, underlying treatment notes. What do the treatment notes say? Well, the treatment notes say that she's doing well. The treatment notes, also from Dr. Farber... That's why he has to use DSM-4 criteria? Is there any such rule? Can you say that again? Is there any rule that the treating physician, in making his determination, must use the DSM-4 criteria? Well, you know, in this case, these doctors, they cite the DSM code for PTSD. And so the ALJ is assuming that they are making the diagnosis according to the DSM. And then looking at the DSM factors, looking at the treating records, and looking at the opinion evidence, and finding that there isn't – it's not done to the rigor that the DSM says this diagnosis should be conducted. Well, that's what I'm asking. Is there something, some rule, some case, that says in order to make a PTSD diagnosis, a doctor must rely on DSM-4 criteria? Or can a doctor rely on something else to reach his diagnosis? You know, I don't think that a doctor has to set forth a criteria. I don't know of any rule, and I don't think there is such a rule. But in this case, the credibility of the claimant was at issue, and it was important. And looking at the treating notes, the ALJ, he is charged with the responsibility of evaluating these opinions and weighing them. And he saw that – Well, it's not just that he weighs it and evaluates it. He has to have good reason with specific reasons that he sets forth as to why he disregards the diagnosis of a treating physician. And his own personal view that he should use a DSM-4 criteria, and that's how a doctor should make his diagnosis. I don't think that that constitutes a valid reason, because this ALJ decides he knows how to make a diagnosis better than a treating physician. Now, if he had an expert who came in and said that this is not the way you reach a conclusion, you should consider the DSM, whatever they are, that would be a different matter. But the ALJ's determination, based on his own knowledge, thoughts, whatever, that this is how you reach a medical conclusion is not the same without some rule, testimony, or something in the record that says his idea of how a doctor should You know, I don't think it's his personal rule, but these doctors are saying they're diagnosing it according to the DSM and they're diagnosing it according to this exact provision. Well, in the record at 187, this reference to diagnosis DSM-4, which is in the treatment notes, and I think this is Dr. Graser, are you saying that that means that he didn't follow the DSM-4, or should we presume because of that reference that he did? In other words, the ALJ seems to hold that because he didn't set out the criteria expressly, that he didn't follow them. If he, if this reference is what it appears to be, it seems to suggest he did follow them. Well, you know, I think that the ALJ here is saying that these doctors made a diagnosis according to the DSM, and that then they cite the PTSD provision. And I don't think the ALJ is saying here that they must lay out, these doctors must lay out the factors underlying a PTSD diagnosis. I don't think that's what's happening here at all. What the ALJ is saying, though, is that these treatment records don't support this diagnosis, and the doctor isn't explaining how he got to this diagnosis. And then another thing to keep in mind, too, is that, you know, those, that evidence was sufficient to find her disabled at one point in time. But then the case was investigated as a result of Dr. Afari, who's not an acceptable medical source, appellant agrees, as stipulated to that. And it was reopened. And then the ALJ here is looking at a lens that's different from this point in time in 2006. In 2009 and in 2008, when this ALJ is looking at this case, what he sees is that the treatment just about began and ended when she was applying for disability. And so when he looks at what the treatment notes, the treatment evidence is in 2008 and 2009, there is none. She stopped seeing doctors once her disability was approved, almost contemporaneously with when her disability was approved. And another thing that the doctor is looking at is that you can finish your thought on this point. And as a result of the CDI investigation and the hearing that the ALJ conducted, he was able to observe that this was a fairly sophisticated individual with a proficiency in English enough to know words and distinguish between psychiatry and psychology and to answer questions in English about her living arrangement, her education, her children, and that that was inconsistent with statements she made to the agency in support of her application, that she couldn't speak or read English at all or understand instructions. And so that also undermined her credibility. Thank you. I just have a couple of things to follow up on. First, the Harvard trauma questionnaire was either in 2007 or 2004. It's really hard to read. I thought it was 2004. I think 2004 makes more sense just because that is during a period of time when she was in treatment. But I don't know that it matters, but I think it's 2004. Okay. Additionally, I think it's important to note that although Dr. McGee did have these doubts, she didn't diagnose malingering. She did a test that's commonly given to assess whether a person is malingering. Ms. Ohm did not present on that test as if she were malingering. Dr. McGee did not diagnose it. In fact, what she diagnosed is depression. Dr. D'Souza did another test, the MFAST, which is in the record, which also didn't indicate that Ms. Ohm was malingering. As far as the diagnosis of PTSD and how the doctors came to it, I think we do need to assume, absent some evidence to the contrary, that doctors are doing what their profession requires them to do. And in the case of a psychiatrist, in the case of a psychologist, or a therapist, generally they follow the DSM in making these diagnoses. And if you look at the record, which I did pretty extensively in my opening brief, the evidence does support a diagnosis of PTSD. And the ALJ can't look at that later, and absent any evidence about what the doctors were doing, assume that they had incorrectly come to the conclusion. And it's clear that they had seen Ms. Ohm for a period of time before they made this diagnosis. So it wasn't the sort of thing where she showed up and said, hey, I survived the Cambodian genocide, and they said, oh, hey, you have PTSD. I guess the reason I was asking about the Harvard trauma questionnaire, and I wanted to know when it happened, is because it seems to me the questions that are put to the person filling it out track in large, to a large extent, the DSM factors. That's absolutely true. So you think it's in 2004? I think it was in 2004, toward the beginning of her treatment. Okay. Thank you. Thank you, counsel. Thank you both. The case is argued will be submitted.
judges: Lynn, Reinhardt, Watford